**UNITED STATES of America Plaintiff,**

v.

**Dr. Chad LIVDAHL, N.D., Dr. Zarah Karim, N.D., Toxin Research International, Inc., Powderz, Inc., the Cosmetic Pharmacy, Inc., and Z Spa, Inc., Defendants.**

No. 04–61717–CIV.

United States District Court,
S.D. Florida.

Jan. 11, 2005.

Russell Koonin, United States Attorney's Office, Miami, Robin S. Rosenbaum, United States Attorney's Office, Ft Lauderdale, FL, for Plaintiffs.

Thomas R. Spencer, Jr., Spencer & Klein, Coral Gables, FL, Robert F. Gehrke, Phoenix, AZ, for Defendants.

## *ORDER GRANTING PRELIMINARY INJUNCTION*[1]

COHN, District Judge.

Plaintiff, United States of America, having filed its Complaint for Emergency Temporary Restraining Order, Preliminary and Permanent Injunction, along with its accompanying Motion and Memorandum of Law on December 23, 2004, against Dr. Chad Livdahl, Dr. Zarah Karim, Toxin Research International, Inc., Powderz, Inc., The Cosmetic Pharmacy, Inc., and Z Spa, Inc., ("defendants"); and the Court, having entered a Temporary Restraining Order on December 23, 2004, and an Amended Temporary Restraining Order on December 28, 2004; and the Court having heard the evidence at hearing on January 10, 2005; and the Court having considered the pleadings, the evidence, the applicable federal statutes, and the arguments of counsel, and it appearing that the defendants, through deceptive practices, are violating and, unless restrained by Order of this Court, will continue to violate the Federal Food, Drug and Cosmetic Act, ("FDCA"), 21 U.S.C. § 331(a), by introducing or causing to be introduced into interstate commerce, or delivering or causing to be delivered for introduction into interstate commerce a misbranded drug; and it also appearing that the defendants are violating, and unless restrained by Order of this Court will continue to violate 18 U.S.C. §§ 1345, 371, and 1001, and it appearing that defendants will not stop these illegal practices unless enjoined by the Court; and it appearing that the defendants' practices expose the public to a great health risk;

IT IS HEREBY ORDERED AND ADJUDGED, that:

1. This Court has jurisdiction over the subject matter herein and over all persons and parties to this action under the FDCA, 21 U.S.C. § 332(a), and under 18 U.S.C. § 1345(a).

■ 2. The Complaint for Injunction states a cause of action under the FDCA, 21 U.S.C. § 301 *et seq.*, as well as under 18 U.S.C. § 1345. The Court concludes that because both statutes expressly authorize injunctive relief, no specific finding of irreparable harm is necessary, no showing of the inadequacy of other remedies at law

---

[1]. This Order is in addition to that oral order rendered in open court on January 10, 2005. The Court has adopted in large part the Government's proposed Order of Preliminary Injunction as the Court's independent analysis and factual findings and legal conclusions are consistent therewith. All factual findings are based on the declarations of numerous witnesses and other evidence presented including the testimony of Drs. Livdahl and Karim.

is necessary, and no balancing of the interests of the parties is required prior to the issuance of a preliminary injunction in this case. *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984); *United States v. Hayes Int'l Corp.,* 415 F.2d 1038, 1045 (5th Cir.1969); *United States v. DBB, Inc.,* 180 F.3d 1277, 1286 (11th Cir.1999); *United States v. Rx Depot, Inc.,* 290 F.Supp 2d 1238, 1246 (N.D.Okla.2003) (specifically applying principle to 21 U.S.C. § 331(a)); *United States v. 22 Rectangular or Cylindrical Finished Devices, More or Less,* 714 F.Supp. 1159, 1167 (D.Utah 1989); *United States v. Barr Laboratories Inc.,* 812 F.Supp. 458, 487 (D.N.J.1993).

3. There is a substantial likelihood that plaintiff will succeed on the merits of its claim that the defendants violate 21 U.S.C. § 331(a), by introducing or causing to be introduced into interstate commerce, or delivering or causing to be delivered for introduction into interstate commerce, drugs, as defined in 21 U.S.C. § 321(g), that are misbranded, as defined in 21 U.S.C. § 352(f)(1). 21 U.S.C. § 321(g)(1) defines a "drug," in relevant part, as ". . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals . . . ." 21 U.S.C. § 352(f) provides that a drug shall be deemed to be "misbranded" "[u]nless its labeling bears (1) adequate directions for use . . . ," among other defects.

4. The United States has clearly established that the defendants are violating the FDCA. Defendants' product bears the label, "For Research Purposes Only— Non Human Use Only," or some derivation thereof. The same disclaimer can be found on the vials of their product, as well as in promotional material, and defendant Toxin Research International's ("TRI")

website. However, the United States has demonstrated that defendants intend the Botulinum Toxin Type A to affect the structure or any function of a human being. There is no question that the Defendants marketed and promoted this product for human use knowing that the FDA had not approved it for human use. In support of this finding, the United States has presented evidence showing:

(A) Defendants' evasiveness and non-disclosure when confronted by FDA Inspectors as to the purpose of their business.

(B) Defendants' large scale marketing and directed sales efforts aimed at selling their product to non-research physicians, such as plastic surgeons, dermatologists, ophthalmologists, and general surgeons. Such marketing was facilitated by spreadsheets, listing the names of doctors, their fields of practice, and their contact information, including a specific spreadsheet of members of the American Dermatological Association.

(C) Defendants' marketing of their product to a dermatologist subsequent to being informed by the dermatologist's office that the dermatologist's office was not engaged in research, and had no use for defendants' product. This is coupled with defendants' refusal to accept the return of the product once the doctor's office notified defendants it had no use for defendants' product.

(D) Defendants' conducting of seminars instructing attendees on the use on human beings of Botulinum Toxin Type A that has not approved by the FDA for use in human beings; including defendants' causing of demonstrations of injections of human beings with Botulinum Toxin Type A that has not been approved by the FDA.

(E) Defendants' distributing of materials at these seminars pertaining to the

injection into human beings of Botulinum Toxin Type A that has not been approved for use on human beings.

(F) Defendants' representations to seminar attendees that their product was cheaper and more effective in the treatment of wrinkles than Allergan's FDA-approved BOTOX® Cosmetic.

(G) Defendant Livdahl stating to his employee, Shannon Alderman, that his supplier in California did not know that TRI was selling the vials of Botulinum Toxin Type A to doctors, and that the California company thought that TRI sold the Botulinum for research purposes only.

(H) Person or person(s) deleting TRI's computer records reflecting sales of Botulinum Toxin Type A to non-research physicians.

(I) Defendants' memorandum to customers, addressing their Frequently Asked Questions, including whether or not the defendants' product can be used on patients, and if the defendants' product was any different than Allergan's.

(J) Extraordinary amounts of Botulinum Toxin Type A being ordered by defendants from List Laboratories, Inc., in a formulation attempting to mimic that of Allergan's BOTOX® Cosmetic.

(K) At the time the United States filed its motion on December 23, 2004, Defendant Toxin Research International's Website, *www.toxinresearch.com*, continuing to be in operation, including the Order Form link for Botulinum Toxin Type A. As of the date of this Order, TRI's website states it is, "Under construction!" and invites customers to "Please visit us again later."

(L) Defendant Z Spa, Inc., continuing to progress with plans to have an "Open House," on January 15 and 16, 2005, as found at *www.z-spa.net/index.htm*, where patrons can expect "Free Education on the latest cosmetic treatment available," and listing Botox® as one of its products, when neither Z Spa, Inc., nor any other defendant have ever received a shipment of Allergan's Botox® Cosmetic.

(M) A letter from defendants, dated December 22, 2004, offering one (1) complimentary 500 IU (5ng) vial of Botulinum Toxin Type A with a customers' next order if there had been any negative affect on their research from the recent events in Florida. Such letter was marketed, *inter alia*, directly to a dermatologist's office, who had previously informed defendants they did not conduct research and had no use for defendants' product.

5. The United States has established that the Botulinum Toxin Type A distributed by the defendants is misbranded under 21 U.S.C. § 352(f)(1) in that it lacks adequate directions for use. In support of this finding, the United States has presented evidence showing that the Botulinum Toxin Type A distributed by defendants had no directions for use on human beings at all.

6. The United States has established that the defendants are introducing or causing to be introduced into interstate commerce, or delivering or causing to be delivered for introduction into interstate commerce their misbranded Botulinum Toxin Type A, under 21 U.S.C. § 321(b)(1). In support of this finding, the United States has presented evidence of invoices to 13 customers within the Southern District of Florida amounting to 33 invoices, showing total sales of $53,211.15. Further Thomas P. Toia, an employee of Advanced Integrated Medical Center, Inc. 1655 E. Oakland Park Boulevard, Fort Lauderdale, Florida, 33334, stated that on two to four occasions, he ordered vials of Botulinum Toxin Type A from TRI for Advanced Integrated by telephone, and received such orders through an interstate carrier, UPS. Additionally, FDA investigators executing the federal search warrant on TRI found

copies of five (5) invoices in the FDA search of TRI, dated December 1 and 2, 2004, and completed order forms for TRI's Botulinum Neurotoxin Type A reflecting sales to: Dr. Robert West at the Almos Heights Skin Clinic in San Antonio, Texas; Dr. Martha Gonzalez, Physician and Surgeon, Ventura California; Dr. Kreg Jenson, Physician and Surgeon, Oren Utah; and Dr. Herbert Smyczek, Newark, New Jersey. Also, the government has shown that Dr. Martin Blau, from New York and Dr. Herve Gentile from Texas, purchased the Botulinum Toxin Type A from TRI.

7. Based on the foregoing, the United States has demonstrated that defendants are violating, and will continue to violate, unless enjoined, the FDCA, 21 U.S.C. 301 *et seq.*, and immediate and irreparable harm will result to the United States and to the public at large if the preliminary injunction is not granted.

8. There is a substantial likelihood the plaintiff will succeed on the merits of its claim that the defendants have violated 18 U.S.C. § 1345, in that the defendants have conspired to commit an offense against the United States, and defraud the United States, as defined in 18 U.S.C. § 371, and that the defendants have made materially false, fictitious, or fraudulent statements or representations in a matter within the jurisdiction of the government of the United States, as defined in 18 U.S.C. § 1001. In support of this finding, the United States has presented evidence showing:

(A) FDA Consumer Safety Officer ("CSO") Randall Johnson inspected TRI's headquarters on October 6, 2004, and met with defendants Livdahl and Karim. Both Livdahl and Karim stated that they sold their Botulinum Toxin Type A only to research institutions and licensed physicians conducting research, and that they had no specific knowledge of the uses TRI customers might find for the Botulinum Toxin Type A. However, an e-mail, dated March 12, 2003, from defendant Livdahl stated they are doing a big push for their July 19 and 20 seminar, sending out 15,000 mailers to the cosmetic, alternative, and dermatological physicians in the next month. At this seminar on July 19 and 20, 2003, defendants represented to seminar attendees that their product was cheaper and more effective in the treatment of wrinkles than Allergan's FDA-approved BOTOX® Cosmetic.

(B) On October 6, 2004, defendant Livdahl refused to provide CSO Johnson with TRI's product distribution list.

(C) On October 20, 2004, CSO Johnson met with defendant Karim who again refused to provide him with responsive records.

(D) Records from TRI indicate that as of December 1 and 2, 2004, TRI continued to sell its Botulinum Toxin Type A to physicians engaged solely in the treatment of humans.

(E) In December 2004, defendants continued to finalize their plans to open Z Spa, a center advertised as having "the most advanced Anti-aging skin care treatments available."

(F) On or about December 1, 2004, a person or person(s) at TRI attempted to delete computer records reflecting sales of Botulinum Toxin Type A. These records were recovered by FDA computer specialists.

(G) On December 22, 2004, defendants sent out a letter continuing to market their Botulinum Toxin Type A to non-research physicians.

9. Based on the foregoing, the United States has shown that defendants are violating, and will continue to violate, unless enjoined, 18 U.S.C. § 1345. The United States has shown probable cause that the defendants engaged in a conspiracy to defraud the United States under 18 U.S.C.

§ 371, and the United States has shown probable cause that the defendants made materially false, fictitious, or fraudulent statements to the government under 18 U.S.C. § 1001, and immediate and irreparable harm will result to the United States and to the public at large if the preliminary injunction is not granted.

IT IS THEREFORE ORDERED AND ADJUDGED that Plaintiff's Motion for Preliminary Injunction is GRANTED.

10. For purposes of this Order, "Botulinum Toxin Type A" encompasses all possible compounds, derivations, and monikers thereof for Botulinum Toxin Type A, including, but not limited to, Botulinum Toxin Type A, Botulinum NeuroToxin Type A, and Clostridium Botulinum Toxin Type A.

11. The defendants and each and all of their directors, officers, agents, representatives, employees, successors, assigns, attorneys, and any and all persons in active concert or participation with any of them (including franchisees, affiliates, and "doing business as" entities) who have received actual notice of this Order by personal service or otherwise, are hereby preliminarily restrained and enjoined under 21 U.S.C. § 332(a), and 18 U.S.C. § 1345, from directly or indirectly doing or causing to be done any of the following:

(A) Introducing or delivering for introduction into interstate commerce any Botulinum Toxin Type A, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man, or intended to affect the structure or any function of the body of man, and any other unapproved new drug or misbranded drug;

(B) Promoting, advertising, or soliciting sales of Botulinum Toxin Type A as a drug;

(C) Instructing, educating, or conducting seminars associated in any manner

with the use of Botulinum Toxin Type A as a drug, and;

(D) Administering Botulinum Toxin Type A to human beings through injection or otherwise;

Unless and until:

(1) an approved new drug application filed pursuant to 21 U.S.C. § 355 is in effect for such drug; or

(2) an approved Biologics License Application ("BLA"), pursuant to 42 U.S.C. § 262 is in effect for such drug; or

(3) an investigational new drug application filed pursuant to 21 U.S.C. § 355(i) and 21 C.F.R. Part 312 is in effect for such drug and the drug is distributed and used solely for the purpose of conducting clinical investigations in strict accordance with the protocol as authorized as part of the investigational new drug application.

12. Because of the great risk of potential harm, defendants are ordered to immediately turn over all Botulinum Toxin Type A in their possession to custody and control of the Food and Drug Administration, ("FDA") care of the FDA District Director Alonza Cruse, Los Angeles District Office, 19701 Fairchild, Irvine, CA 92612, (949) 608–2900, as it is the FDA Los Angeles District Office which regulates FDA compliance in Arizona. Defendants are further ordered to file with this Court within ten (10) days of entry of this Order a sworn affidavit from a person with actual knowledge that all such Botulinum Toxin Type A has been turned over to FDA.

13. Representatives of the FDA shall be permitted, without prior notice, and as when FDA deems necessary, to make inspections of defendant' facilities, and, without prior notice, take any other measures necessary to monitor and ensure continuing compliance with the terms of this Order. During such inspections, FDA representatives shall be permitted

access to all buildings, equipment, finished and unfinished articles of drug and biological products, labeling, including promotional material and website information, manufacturing and shipping records, and all records pertaining to the defendants, defendants' customers or patients, in defendants' possession, or accessible by defendants, and to take photographs and make video recordings, to take samples of defendant' finished and unfinished articles of drug and biological products, and to examine and make copies of all records. Such inspections shall be permitted upon presentation of a copy of this Order and appropriate credentials. The inspection authority granted by this Order is apart from, and in addition to, the authority to conduct inspections under 21 U.S.C. § 374.

14. Defendants shall reimburse FDA for the costs of all FDA inspections, investigations, supervision, reviews, analyses, and examinations that FDA deems necessary to evaluate defendants' compliance with this Order, including the costs of inspection, analysis, travel and subsistence expenses, if necessary. The costs of such inspections shall be borne by defendants at the prevailing rates in effect at the time such costs are incurred. In addition, if any defendant violates this Order and is found in civil or criminal contempt thereof, defendant shall, in addition to other remedies, reimburse plaintiff for its attorney fees, including overhead, investigational expenses, and court costs relating to such contempt proceedings.

15. Immediately upon entry of this Order, the defendants shall institute a recall of any and all Botulinum Toxin Type A that they have distributed. Defendants' recall notice shall be distributed to every person who received or may have received their Botulinum Toxin Type A from defendants, and shall contain such information as FDA deems appropriate. Defendants shall provide to FDA any and all records, and shall issue any press releases that the FDA deems necessary to effectuate the recall. The recall shall be conducted in consultation with the FDA Recall Coordinator Craig Hoover, Los Angeles District Office, 19701 Fairchild, Irvine, CA 92612, (949) 608–2900, and in accordance with procedures and time limits identified by FDA. All costs of the recall, including the costs of FDA's involvement in the recall, shall be born by the defendants.

16. The defendants shall notify FDA at least 10(ten) days before any change in the ownership or character of their business, such as dissolution, assignment, or sale, which change results in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in the corporate structure of TRI, Powderz, Inc., The Cosmetic Pharmacy, Inc., and Z Spa, Inc., that may affect compliance with this Order. The defendants shall provide a copy of this Order to any successor or assign at least fifteen (15) days before any sale or assignment. This Order shall be binding on all successors and assigns.

17. This Court retains jurisdiction of this action for the purpose of enforcing or modifying this Order and for the purpose of granting such additional relief as may hereafter appear necessary or appropriate.

18. Except as provided above, each party shall bear its own costs and attorneys' fees in this action.

19. All decisions specified in this Order to be made by FDA shall be vested in the discretion of FDA. FDA decisions under this Order shall be reviewed by the Court, if necessary, under the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A). Review by a court of any FDA decision rendered pursuant to this Order shall be conducted without any discovery by either party and shall be based

exclusively on the written record before FDA at the time the decision was made.