IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 2, 2008

Charles R. Fulbruge III
Clerk

No. 07-30516

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BERNITA LEGRO, RONALD WILKERSON; DONALD WILKERSON;
WILKERSON TAX SERVICES LLC,

Defendants - Appellants.

Appeal from the United States District Court
for the Middle District of Louisiana
3:07-CV-247

Before JONES, Chief Judge, and DAVIS and GARZA, Circuit Judges.

PER CURIAM:[*]

Bernita Legro, Ronald Wilkerson, Donald Wilkerson (the "individual defendants"), and Wilkerson Tax Services, L.L.C. ("WTS"), appeal the district court's order granting a preliminary injunction under the Fraud Injunction Statute, 18 U.S.C. § 1345. The order froze $520,000 in cashier's checks, the alleged proceeds of fraud, which the individual defendants withdrew from WTS

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

bank accounts on the same day that the IRS executed a search warrant at WTS as part of a criminal fraud investigation. We AFFIRM.

WTS is in the business of preparing tax returns. The individual defendants operate WTS. This case arises from a criminal fraud investigation of WTS launched by the criminal investigation division of the Internal Revenue Service ("IRS").

The IRS's analysis of the tax returns prepared by WTS revealed what the IRS characterized as a pervasive likelihood of fraud. Approximately two-thirds of the 2006 returns prepared by WTS claimed an apparently excessive Telephone Excise Tax Refund ("TETR") based on evidently fictitious phone charges.[1] These returns claimed an average telephone excise tax refund credit of $2,172. To be able to claim this credit, an individual taxpayer would need to have incurred long-distance telephone charges of approximately $72,400 over a 41-month period. The 2006 average reported wages for all of WTS's clients was only about $14,325.

The WTS returns contained other information also suggestive of fraud, including false information about filing status, exemptions, deductions, and qualification for the earned income tax credit ("EITC"). In addition, eight out of nine of the returns prepared by WTS contained false and misleading tax preparer identification numbers. Half of the returns contained "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" as the individual tax preparer's identification number. Furthermore, witness complaints and evidence obtained from an undercover investigation demonstrated that WTS routinely falsified taxpayer information to generate inflated, undeserved refunds for its clients, unbeknownst to its clients.

---

[1] The TETR was a one-time refund available only on the 2006 federal income tax return. The refund was based on taxes previously paid on long-distance charges for a particular 41-month period (February 2003 to August 2006).

Armed with this evidence, the IRS obtained a search warrant for WTS's premises, located at two offices in Baton Rouge, Louisiana. The same day the warrant was executed, indeed while the warrant was being executed, the individual defendants collectively withdrew $520,000 from WTS accounts. Each of the individual defendants took part in withdrawing these funds, obtained in various denominations: Bernita Legro withdrew two $50,000 checks; Donald Wilkerson withdrew a $60,000 check; and Ronald Wilkerson withdrew $360,000 in the form of forty $9,000 checks.

The Government then brought this action pursuant to the Fraud Injunction Statute, 18 U.S.C. § 1345, to freeze the allegedly fraudulent proceeds of WTS and the individual defendants. Over a two-day preliminary injunction hearing, the Government presented evidence that WTS was used as a vehicle to defraud the United States and HSBC Bank, a federally insured financial institution.

The scheme, as presented by the Government, was as follows. WTS would prepare false tax returns on behalf of its clients. Then, WTS would electronically submit these false returns (using the wires) through an intermediary to the IRS and HSBC. Based on the information in the returns, HSBC would decide whether to grant a loan to the taxpayer, a loan secured by the anticipated refund represented in the tax return. These loans are known as refund anticipation loans. If HSBC approved the loan but the IRS did not pay the full refund amount, HSBC lost its security. Once approved, HSBC would provide the refund anticipation loan to WTS to be paid to WTS's client.

In addition, HSBC would pay WTS's fees, including a loan processing fee, an electronic filing fee, and a tax preparation fee. At one point, HSBC informed WTS that its fees were excessive. Nonetheless, these fees were paid directly to a Chase Bank account, which the Government identified at the preliminary injunction hearing. In total, HSBC paid to WTS approximately $806,000 in fees

for the 2006 tax year. The $520,000 that the individual defendants withdrew from the WTS accounts all originated from the account into which HSBC paid these fees.

According to the Government, the scheme harmed and affected both the United States and HSBC. It harmed the United States because WTS clients received undeserved refunds. The scheme harmed HSBC because its loan decisions were based in part on the false information contained in the WTS-prepared tax returns. Furthermore, once the IRS detected a pervasive likelihood of fraud in the returns prepared by WTS and stopped paying the refunds on those returns, HSBC essentially lost the security for the refund anticipation loans paid to WTS clients; specifically, HSBC claimed that it suffered losses of at least $700,000 because the IRS stopped paying the refunds. In addition, WTS profited from the fees it obtained as a result of preparing the false tax returns, fees financed by the inflated refunds.

Presented with this evidence, the district court entered a preliminary injunction pursuant to § 1345, freezing the $520,000, which was withdrawn by the individual defendants on the same day the IRS executed its search warrant. WTS and the individual defendants appealed.

We review a district court's decision to grant a preliminary injunction for an abuse of discretion. Ridgely v. Fed. Emergency Mgmt. Agency, 512 F.3d 727, 734 (5th Cir. 2008) (citing Guy Carpenter & Co. v. Provenzale, 334 F.3d 459, 463 (5th Cir. 2003)). We review the district court's factual findings for clear error and its legal conclusions de novo. Id.

The Fraud Injunction Statute provides in part:

> If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title) . . . or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court . . . to enjoin such alienation or disposition of property . . . .

18 U.S.C. § 1345(a)(2)(A). A "banking law violation" includes the commission of, or the conspiracy to commit, mail or wire fraud "affecting a financial institution." 18 U.S.C. § 3322(d)(1)(B) ("the term 'banking law violation' means a violation of, or a conspiracy to violate . . . section 1341 [mail fraud] or 1343 [wire fraud] affecting a financial institution . . . .").

The parties disagree about the applicable standard of proof for obtaining a § 1345 injunction. The appellants argue that the Government must establish by a preponderance of the evidence that a § 1345 injunction is proper. See, e.g., United States v. Quadro Corp., 916 F. Supp. 613, 617 (E.D. Tex. 1996) (applying the preponderance standard in granting a § 1345 preliminary injunction; collecting cases). The Government argues that a lesser evidentiary burden is appropriate, such as probable cause. Nevertheless, the Government also argues that it satisfied either standard in this case. The district court applied the preponderance standard. We do not decide which standard of proof applies to a preliminary injunction pursuant to § 1345 because even assuming arguendo that the more demanding preponderance standard applies, the Government satisfied that standard in this case.

The Government produced sufficient evidence at the preliminary injunction hearing to show by a preponderance of the evidence that WTS was engaged in a fraudulent scheme utilizing the wires that affected both the United States and HSBC, a financial institution. Furthermore, the Government produced sufficient evidence to prove by a preponderance of the evidence that the income generated from WTS's fees, paid by HSBC, was obtained as a result of the fraudulent scheme. Finally, the individual defendants' activities on the day that the IRS executed the search warrant—withdrawing $520,000 of the fraudulent proceeds in the form of cashier's checks of various denominations—was sufficient circumstantial evidence to prove by a

preponderance that the individual defendants intended to alienate or dispose of the proceeds obtained as a result of the fraudulent scheme.

Having carefully reviewed the record on appeal, the arguments of the parties, and the applicable law, we are satisfied that the district court did not abuse its discretion in granting the preliminary injunction pursuant to § 1345. Therefore, we AFFIRM.