**UNITED STATES of America,**
**Plaintiff,**

v.

**Sila LUIS, et al., Defendants.**

**Case No. 12–23588–CIV.**

United States District Court,
S.D. Florida.

June 21, 2013.

Susan Torres, U.S. Attorney's Office, Miami, FL, for Plaintiff.

Howard Milton Srebnick, Black Srebnick Kornspan & Stumpf, Scott Alan Srebnick, Miami, FL, for Defendants.

### ORDER

PAUL C. HUCK, District Judge.

THIS MATTER is before the Court upon the United States of America (the "Government['s]") Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction under 18 U.S.C. § 1345 [D.E. # 4] and Defendant, Sila Luis ("Luis['s]") Motion to Modify the Restraining Order to Release Assets for the Defense of the Related Criminal Case [D.E. # 46]. For the reasons discussed below, the Motion for Preliminary Injunction is granted and Luis's Motion to Modify the Restraining Order is denied.

### A. Background

a. *Statutory Basis for Injunctive Relief Under 18 U.S.C. § 1345*

■ Section 1345 allows courts to grant injunctive relief to prevent certain types of fraud and to prevent alienation of property associated with the fraud. 18 U.S.C. § 1345. Thus, a court may enter an injunction under § 1345 preventing mail fraud, wire fraud, banking laws, or the commission of a federal health care offense.[1] *Id.* Section 1345 also allows a court to enter an injunction when an individual alienates or disposes of any property obtained as a result of such violations, to prevent any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value.[2] *Id.* The "equivalent value" language means that when some of the assets that were obtained as a result of fraud cannot be located, a person's substitute, untainted assets may be restrained instead. *See United States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999).

b. *The Burden of Proof and Elements for Injunctive Relief Under § 1345*

■ As to the elements for injunctive relief, a reasonable reading of § 1345 indi-

---

**1.** As used in this title, the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate—

(1) section 669, 1035, 1347, or 1518 of this title or section 1128B of the Social Security Act (42 U.S.C. 1320a–7b);or

(2) section 287, 371, 664, 666, 1001, 1027, 1341, 1343, 1349, or 1954 of this title section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 331), or section 501 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1131), or section 411, 518, or 511 of the Employee Retirement Income Security Act of 1974, [1] if the violation or conspiracy relates to a health care benefit program.

18 U.S.C. § 24.

**2.** The following is the statutory language creating the right to injunctive relief to prevent alienation of property:

(a)(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a [Federal health care offense] or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—

(A) to enjoin such alienation or disposition of property; or

(B) for a restraining order to—

(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value ...

18 U.S.C. § 1345.

cates that the Government bears the burden to establish that: (1) a Federal health care offense has been committed; (2) the total amount of proceeds obtained from the criminal activity; and (3) that there has been dissipation of assets received as a result of the criminal activity. *See United States v. Brown,* 988 F.2d 658, 663 (6th Cir.1993) (finding § 1345 requires the Government demonstrate that a predicate offense has been committed and the extent of the fraud); *see also* § 1345 (requiring dissipation of assets for a court to award injunctive relief).

■ Regarding the applicable burden of proof, there is considerable disagreement in the case law. Several courts have applied the preponderance of the evidence standard to claims for injunctive relief under § 1345. *See Brown,* 988 F.2d 658, 663 (6th Cir.1993); *United States v. Williams,* 476 F.Supp.2d 1368, 1374 (M.D.Fla.2007) (applying the preponderance of the evidence standard); *United States v. Sriram,* 147 F.Supp.2d 914, 938 (N.D.Ill.2001) (same); *United States v. Barnes,* 912 F.Supp. 1187, 1198 (N.D.Iowa 1996) (same); *United States v. Quadro Corp.,* 916 F.Supp. 613, 617 (E.D.Tex.1996) (same); *see also United States v. Legro,* 284 Fed.Appx. 143, 145 (5th Cir.2008) (recognizing disagreement about whether probable cause or preponderance of the evidence standard applies to state a claim for injunctive relief under § 1345 and declining to resolve the issue). Other courts have concluded that a showing of only probable cause is required. *See United States v. Livdahl,* 356 F.Supp.2d 1289, 1294 (S.D.Fla.2005); *United States v. Fang,* 937 F.Supp. 1186, 1197 (D.Md.1996); *United States v. Davis,* No. 88–1705–CIV–ARONOVITZ, 1988 WL 168562, at *1 (S.D.Fla.1988). This Court agrees with those courts that found probable cause is the correct burden of proof

#### c. *Evidence of Federal Health Care Offenses and Dissipation of Assets*

Pursuant to § 1345, the Court previously entered a temporary restraining order ("TRO") restraining all of Luis's assets. The Government seeks to convert the TRO into a preliminary injunction, and the Court held a hearing on that matter on February 6, 2013. As a basis for the requested injunctive relief, the Government points to the parallel criminal prosecution, where Luis is charged with violations of 18 U.S.C. § 1349 (conspiracy to commit health care fraud) and 18 U.S.C. § 371 (conspiracy to defraud the United States and to commit offenses against the United States). Luis is also charged with violation of 42 U.S.C. § 1320a–7b(b)(2)(B) (paying health care kickbacks) and a forfeiture count under 18 U.S.C. § 982. Luis was indicted by a grand jury on these charges. According to the indictment, the offenses resulted in $45 million of improper Medicare benefits being paid. The parties agree that Luis has much less than $45 million in personal assets.

At the hearing, the Court accepted three declarations of Federal Bureau of Investigation Special Agent Clint Warren ("Special Agent Warren") as direct testimony. Special Agent Warren investigated Luis's businesses, LTC Professional Consultants, Inc. ("LTC") and Professional Home Care Solutions, Inc. ("Professional") for Federal health care fraud. During the investigation, Special Agent Warren received information from nine cooperating witnesses ("CWs") who worked as nurses and patient recruiters for LTC, Professional, or both.

The CWs said that LTC and Professional defrauded Medicare during the period of January 2006 to June 2012. Before the fraudulent scheme was put into place, Luis signed Medicare enrollment agreements in

2003, 2004, and 2005, whereby she agreed to abide by Medicare laws and regulations, including the Anti-kickback statute. According to the information provided to Special Agent Warren, LTC and Professional paid nurses to recruit patients. The nurses, in turn, gave the patients a portion of the kickbacks in the form of direct payments. The CWs also told Special Agent Warren that LTC and Professional fraudulently billed Medicare for services that were not medically necessary or were not actually provided. One CWs estimated that at least 90% of all Professional and LTC patients were receiving kickbacks. Eight of these CWs specifically identified patients who received kickbacks. The total paid by Medicare for claims submitted on behalf of these patients who were identified was $ 4,356,553.85. During the period of this fraud, however, LTC and Professional collected a total of approximately $45 million from Medicare billings.

Special Agent Warren's declarations also provided information about assets being dissipated. Luis and the other defendants transferred monies from LTC and Professional to themselves directly and by the use of shell corporations that were owned by Luis's family members. There was also evidence that Luis used the funds to purchase luxury items, real estate, automobiles, and to travel. According to the declarations, Luis also received approximately $4,490,000 of the funds directly. In addition, although the investigation uncovered the fact that Medicare paid LTC and Professional $45 million dollars, only a fraction of the funds were located.

**B. Discussion**

a. *The Indictment and Declarations of Special Agent Warren Establish Probable Cause to Satisfy the Elements of § 1345*

 Initially, the indictment and declarations establish probable cause to satis-

fy the elements for injunctive relief under § 1345. That is, there is probable cause to believe that: (1) Federal health care offenses have been committed; (2) $45 million was obtained illegally as a result of those offenses; and (3) that there has been dissipation of those monies. An indictment is sufficient to establish probable cause that offenses have been committed and the amount of the proceeds from those offenses. *See United States v. Bissell,* 866 F.2d 1343, 1349 (11th Cir.1989). Here, the Grand Jury indicted Luis for committing Federal health care offenses and found that LTC and Professional improperly obtained $45 million from those offenses.

Furthermore, in other situations where probable cause is required, the finding of probable cause may properly rest upon the affidavit of a law enforcement officer. *See Illinois v. Gates,* 462 U.S. 213, 226, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (explaining that issuance of a search warrant may be based upon an affidavit of a law enforcement officer when based upon a proper information source). Section 1345 requires there be dissipation of the proceeds. As discussed above, in his investigation, Special Agent Warren discovered that Luis used the funds to purchase luxury items, real estate, automobiles, and for travel. In addition, the investigation uncovered the fact that Medicare paid LTC and Professional $45 million dollars, but only a fraction of the assets could be located. The declaration, which is based upon information discovered in the criminal investigation, establishes probable cause to believe that there has been dissipation of assets.

Thus, the initial requirement to obtain a preliminary injunction, restraining up to

$45 million of Luis's assets, has been met.[3]

b. *Luis's Right to a Hearing and Right to Challenge the Factual Basis of the Probable Cause Finding*

The parties disagree about whether Luis was entitled to a hearing and, if so, the scope of the hearing and whether she has the right to challenge the probable cause determination. The Government's position is that Luis has no right to challenge the factual basis of the probable cause finding, which is based solely upon the indictment and declarations of Special Agent Warren. Luis, on the other hand, argues that she is entitled to a full adversarial hearing where she should be allowed to cross-examine the CWs. In this case, Luis was permitted a hearing, where she was allowed to cross-examine Special Agent Warren but was not permitted to cross-examine the CWs.

■ As an initial matter, § 1345 does not require a hearing by its language. However, the Fifth Amendment provides "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Accordingly, the general rule is that a person cannot be deprived of property without a prior hearing. *Bissell*, 866 F.2d at 1352. However, there is an exception that exists when a criminal defendant's assets are seized or restrained. *See id.* But this exception does not mean that a criminal defendant subject to asset restraint is never permitted a hearing; a post-seizure hearing is sometimes required. *Id.*

■ In the criminal forfeiture context, the factors to determine whether a hearing is required are derived from the Supreme Court's Sixth Amendment speedy trial analysis in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *Bissell*, 866 F.2d at 1352. However, because § 1345 is a civil statute, the factors from *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) are determinative. These factors are: "the private interest that will be affected by the official action; ... the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and ... the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. 893.

■ The *Mathews* factors weigh in favor of a hearing when all of a criminal defendant's assets are restrained under § 1345, which is the case here. The Eleventh Circuit has explained that "[b]eing effectively shut out by the state from retaining the counsel of one's choice in a serious criminal case is a substantial source of prejudice." *United States v. Kaley (Kaley I)*, 579 F.3d 1246, 1258 (11th Cir.2009); *see also United States v. Kaley (Kaley II)*, 677 F.3d 1316, 1332 (11th Cir. 2012) (Edmonson, J., concurring) ("Property rights, in themselves, deserve to be amply guarded by American courts. But when a citizen's liberty ... depends to a high degree on his property, the stakes are particularly high."). Moreover, there is also a risk of erroneous deprivation without a hearing: "A prosecutor has everything to gain by restraining assets that ultimately may not be forfeited. By doing so, he can stack the deck in the govern-

---

**3.** Even under the preponderance standard, the Government has carried its burden of proof to enter an injunction restraining at least $40.5 million dollars, which is 90% of $45 million. This finding is based on the indictment, as well as Special Agent Warren's affidavits detailing the crimes, receipt of Medicare funds, and dissipation of assets, including CW9's statement that 90% of LTC and Professional's patients received kickbacks.

ment's favor by crippling the defendant's ability to afford high-quality counsel." *Kaley I*, 579 F.3d at 1266 (Tjoflat, J., concurring). Although there is no indication of prosecutorial abuse in this case, the existence of these incentives increase the likelihood the risk of an erroneous deprivation without a hearing. The third factor—the government's interest and the burdens associated with additional procedural requirements—also weighs in favor of a hearing. While the Government has an interest in not previewing its criminal case before the criminal trial, this problem can be alleviated by properly limiting the scope of the hearing.

The Government, however, contends that no hearing was required because § 1345 permits restraint of substitute assets that are not traceable to criminal activity. As discussed above, the indictment and declarations establish probable cause to believe that Luis committed Federal health care offenses, resulting in $45 million of improper Medicare benefits being paid, and that she has dissipated those assets. There is also no dispute over the fact that Luis is in possession of much less than $45 million in personal assets. As such, assuming the probable cause finding is correct, because § 1345 permits the restraint of substitute assets, there is no possibility that a preliminary injunction could reach assets that are not properly subject to restraint under § 1345. Therefore, the Government's position is that there is nothing that could be challenged at a hearing because Luis "may not challenge the validity of the indictment itself. . . ." *Bissell*, 866 F.2d at 1349.

However, the Government's position on the due process right to a hearing was rejected by *Kaley I*. In that case, the district court found that there was probable cause to believe that certain assets were traceable to a criminal offense and,

therefore, properly subject to a protective order restraining the property. *Kaley I*, 579 F.3d at 1256. Relying on *Bissell*, the district court further found that an evidentiary hearing was not required because the defendants were not permitted to challenge the validity of the indictment. *Id.* The *Kaley I* court found that the district court erred on this point. *Id.* at 1257–58. According to the opinion, "notwithstanding the . . . probable cause determination, the [defendants] were entitled to challenge the restraints on their assets; in doing so, they would not be requiring the Government to establish the charged offense." *Id.* at 1258.

 In accordance with her due process right to a hearing, Luis was permitted an evidentiary hearing and the opportunity to cross examine Special Agent Warren. Contrary to Luis's position, however, she had no right to cross-examine the CWs. This type of extensive hearing would be tantamount to requiring the Government to preview its entire case. However, for the reasons discussed above, the Government's position that Luis was not permitted to a hearing and is not permitted to challenge the initial probable cause finding is misplaced.

### c. *Luis's Arguments Opposing a Preliminary Injunction*

Luis raises two arguments challenging the factual basis for probable cause. First, she argues that the Government has not proffered evidence of a violation of the Anti-kickback Statute, 42 U.S.C. § 1320a–7b(b)(2)(B). According to Luis, in this case, payment of kickbacks falls within the safe-harbor provision of 42 C.F.R. § 1001.952 because the payments were to employees of LTC and Professional. Luis further argues that there is no evidence of a violation of 18 U.S.C. §§ 1347, 1349 because the Medicare certifications she

signed were submitted before the alleged kickback scheme took place.

Additionally, Luis makes several other arguments challenging the entering of a preliminary injunction in this case. She argues that the application of § 1345 violates the *ex post facto* clause. Luis further argues that the Sixth Amendment requires the release of funds to pay attorney's fees and argues that the language of § 1345 does not permit the restraint of assets needed for attorney's fees. Each of these arguments is discussed below.

i. *The payment of kickbacks in this case do not fall within the safe-harbor provisions of the Anti-kickback statute*

Luis first contends that some of the payments made to nurse/patient recruiters do not violate the Anti-kickback statute, § 1320a–7b(b)(2)(B).[4] To support this position, she relies upon the "safe-harbor" provision contained in 42 C.F.R. § 1001.952, which provides:

> As used in section 1128B of the Act, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952. A similar safe-harbor provision is contained in the statute itself. That version of the safe-harbor provides that the prohibition against paying kickbacks will not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a–7b(b)(3)(B).

Special Agent Warren's declaration indicates that CW1, CW2, CW3, and CW6 were employees of LTC, Professional, or both. Based on this, Luis argues that these individuals fall into the ambit of the safe harbor and contends that payments to them for recruiting patients were not improper. According to Luis, the safe-harbor will apply so long as "payments to them for referring patients ... [generated revenue] for services rendered and medically necessary." As such, Luis contends that $1,826,746 of revenue generated by payment patient referrals was not generated illegally. However, Luis misinterprets the scope of the safe-harbor provisions.

■ For either safe-harbor provision to apply, the remuneration must have been made to the employee for furnishing or providing covered items or services or for items or services payable under Medicare. This is evident from the text of the safe-harbor provisions, as well as the Eleventh Circuit's decision in *United States v. Starks*, 157 F.3d 833 (11th Cir.1998). The text of the safe-harbor provision upon which Luis relies states that "remunera-

---

4. Section 1320a–7b(b)(2)(B) provides:
(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
42 U.S.C. § 1320a–7b(b)(2)(B).

tion" does not include "any amount paid by an employer to an employee ... *in the furnishing* of any item or service for which payment may be made in whole or in part under Medicare." 42 C.F.R. § 1001.952 (emphasis added). Similarly, the safe harbor contained in § 1320a–7b states that it will apply to "any amount paid by an employer to an employee ... *for employment in the provision* of covered items or services." § 1320a–7b(b)(3)(B) (emphasis added). The emphasized language in both of these provisions makes clear that the safe-harbor provisions will only apply when payments made to an employee compensate the employee for furnishing or providing covered items or services or items or services payable by Medicare, not simply for referring patients.

This was also the Eleventh Circuit's view in *Starks,* 157 F.3d at 839, where the court considered a vagueness challenge to the employee safe-harbor provisions. In that case, two individuals (Angela Starks and Barbara Henry) were paid for referring patients to Future Steps, Inc, which was a "corporation that developed and operated treatment programs for drug addiction." *Id.* at 835. Although Starks and Henry referred patients, they did not personally provide any medical services. *Id.* at 835–36. Starks, Henry, and Andrew Siegel, the owner of Future Steps, were convicted of violations of the Anti-kickback statute. *Id.* at 837. Starks and Siegel appealed their convictions, arguing that the safe-harbor provision contained in § 1320a–7b is unconstitutionally vague. *Id.* at 839. Rejecting this argument, the court found that, even if Starks and Siegel believed they were bona fide employees, the safe-harbor was not vague, as applied, because Starks and Henry were not com-

pensated for providing "covered items or services." *Id.; see also United States v. Borrasi,* 639 F.3d 774, 782 (7th Cir.2011) (finding as long as some portion of a payment is for referrals, the safe-harbor provisions will not apply).

■ Here, Special Agent Warren's declaration states that CW2, CW3, and CW6 were paid for recruiting patients.[5] Even if these patients ultimately received legitimate medical care, payments to these nurse/recruiters for referring patients to LTC and Professional violate the Anti-kickback statute. Therefore, it is irrelevant whether the nurses were bona fide employees paid for "covered items or services" because the payments to them were, at least in part, for their illegal patient referrals.

Furthermore, even if Luis's view of the scope of the safe harbor provisions were correct, her contention that the patients, who were referred by these CWs, received medically necessary services is dubious. According to the declaration, after patient recruiters were compensated for referring patients, "LTC and Professional ... would then fraudulently bill Medicare for home health services that were not medically necessary or were never provided." For this additional reason, the safe-harbor provisions do not apply here.

ii. *There is probable cause to establish a knowing misrepresentation to Medicare sufficient to constitute violations of 18 U.S.C. §§ 1347, 1349*

Luis further argues that there is not sufficient evidence to find that there has been a knowing misrepresentation sufficient to amount to a violation 18 U.S.C. §§ 1347, 1349[6] and, therefore, the Government cannot establish "Federal health care offenses" to restrain her assets under

---

5. Although Luis refers to CW1 when making this argument, CW1 was not a patient recruit-

er and, therefore, is not relevant to her argument.

6. Section 1347 provides, in pertinent part:

§ 1345. To support this argument, Luis argues that a violation of §§ 1347, 1349 requires her to submit a representation that she will comply with Medicare rules *during* the period of time she submits improper Medicare claims. This argument fails because, as discussed below, all that is required is that a certification of compliance be submitted *at some point before* a non-complying claim is knowingly submitted. That requirement is satisfied here.

Luis's erroneously relies upon *United States v. Medina*, 485 F.3d 1291 (11th Cir.2007). One issue considered in *Medina* was whether there was sufficient evidence of health care fraud to sustain convictions against four individuals who were convicted for violations of § 1347. *Id.* at 1295. The court first found that a conviction under § 1347 requires the defendant make a "knowing false or fraudulent representation to Medicare." *Id.* at 1298. The court then found that, as to one of the defendants, her conviction for violation of § 1347 that was based on claims submitted before she signed Medicare provider applications (agreeing to abide by Medicare rules) should be reversed because there was no evidence of a knowing, false representation. *Id.* at 1298. However, the convictions that were based on kickback tainted claims that were submitted after she signed Medicare provider applications were upheld. *Id.* As to those counts, there was sufficient evidence to sustain the convictions because the defendant made a knowing false or fraudulent representation to Medicare by signing the provider applications, promising to comply, and then knowingly submitted tainted claims to Medicare. *Id.*

■ In this case, Luis acknowledged that she signed Medicare enrollment applications in 2003, 2004, and 2005 and, by doing so, certified that she would abide by Medicare law. There is evidence that she later submitted claims that violated the law, including the Anti-kickback provision. Under *Medina*, it does not matter that the representations in certifications were made several years before the claims were submitted. All that is required is that there is a representation that one will comply with Medicare law followed by a knowingly non-compliant claim. Therefore, by allegedly submitting non-compliant claims to Medicare after signing the applications, the knowledge requirement of § 1347 and § 1349 is satisfied for purposes of § 1345.

■ Luis makes an additional argument that the Government must demonstrate the United States suffered a "loss" to restrain assets under § 1345. In Luis's view, despite the payment of kickbacks, the United States does not suffer a loss as long as medically necessary services are performed. This argument fails because § 1345 does not require the United States to suffer a loss. All that is necessary is that a person is "alienating or disposing of property, or intends to alienate or dispose of property" that is "obtained as a result of a ... Federal health care offense ...." § 1345.

### iii. The application of § 1345 to this case does not violate the ex post facto clause

Luis further argues that the *ex post facto* clause, contained in Article I, Section

---

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent pretenses, representations, or prom-

ises, any of the money or property owned by, or under the custody or control of, any health care benefit program.
18 U.S.C. § 1347. Section 1349 makes conspiracy to violate § 1347 a crime. *See* 18 U.S.C. § 1349.

9 of the U.S. Constitution, prohibits § 1345 from applying here. Luis points out that the statutory term "Federal health care offense" did not include payment of kickbacks until March 23, 2010. *See* 18 U.S.C. § 24 (prior to 2010 amendment). Therefore, § 1345 did not authorize the restraint of assets based upon payment of kickbacks until that date. Luis argues that because the Government's proffer of evidence relates solely to kickbacks that occurred before March 2010, restraint of assets is not permitted.

▬▬ However, even assuming that the *ex post facto* clause is implicated by § 1345, Luis's argument is fundamentally flawed. The prior version of § 24, which defines the term "Federal health care offense," included violations of the general conspiracy statute, 18 U.S.C. § 371. *Id.* A violation of § 371 was included in the definition of Federal health care offense to the extent that the crime involved "a health care benefit program." *Id.* The term "health care benefit program" was defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* Accordingly, under the older version of the statute, a conspiracy to pay kickbacks to receive benefits under Medicare in violation of § 371 was a Federal health care offense and could properly result in an injunction under § 1345. *See id.*

Here, the indictment charges Luis with a count for conspiracy to pay kickbacks in violation of § 371. In addition to establishing probable cause to believe the Anti-kickback statute has been violated, the evidence before the Court is sufficient to establish probable cause to believe that § 371 has been violated and resulted in

$45 million of improper Medicare benefits being paid. Thus, even under the older version of § 24, an injunction could be entered under § 1345 for violation of § 371. As such, there is no *ex post facto* issue.

*iv. The Sixth Amendment does not prohibit the restraint of substitute, "untainted" assets*

Luis also argues that the Sixth Amendment guarantees her a right to use assets that are not traceable to Federal health care offenses to select and retain counsel of her choice for her defense in the parallel criminal case. The Government's argument is that regardless of whether or not assets were obtained legitimately, there is no Sixth Amendment impediment to the assets being frozen as long as a statute permits restraint of substitute assets. According to the Government, because § 1345 allows substitute, untainted assets to be restrained, Luis has no Sixth Amendment right to use the assets to hire counsel of her choice.

▬▬ It is undisputed that "an element of [the Sixth Amendment right to counsel] is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Indeed, "[t]he Sixth Amendment comprehends a qualified right to select and be represented by counsel of choice because 'were a defendant not provided the opportunity to select his own counsel at his own expense, substantial risk would arise that the basic trust between counsel and client, which is a cornerstone of the adversary system, would be undercut.'" *Bissell*, 866 F.2d at 1351 (quoting *United States v. Koblitz*, 803 F.2d 1523, 1528 (11th Cir.1986)). However, this qualified right does not permit a criminal defendant to use assets that are the proceeds of crimi-

nal activity to retain counsel. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *Bissell*, 866 F.2d at 1351. This is so because "[a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those assets are the only way that that defendant will be able to retain the attorney of his choice." *Caplin*, 491 U.S. at 626, 109 S.Ct. 2646.

The more difficult question is the one presented here. That is, whether a criminal defendant has a Sixth Amendment right to use untainted, substitute assets to retain counsel of choice. Although the answer to this question is far from clear, the Fourth Circuit's opinion in *In re Billman*, 915 F.2d 916, 921 (4th Cir.1990) supports the Government's position. In *Billman*, a defendant was charged with racketeering and a forfeiture count, and the defendant then transferred some of the assets to another person. *Id.* at 918. The district court found that the assets that were transferred could not be directly linked to the racketeering, and the circuit court determined that it was bound to accept this finding. *Id.* As such, they were "substitute" assets. *Id.* at 920. The transferee argued that she had a Sixth Amendment right to use the funds to retain counsel of her choice. *Id.* at 921–22. The court rejected this argument because the substitute assets were subject to restraint under § 1963. *Id.* Therefore, the *Billman* court's view is that there is no Sixth Amendment impediment to the seizure of substitute assets pursuant to the statute because those assets are "contraband," even if they were not the proceeds of criminal activity. *Id.* at 922; *see also United States v. Am. Therapeutic Corp.*, 797 F.Supp.2d 1289, 1293–94 (S.D.Fla. 2011) (finding no Sixth Amendment right to use untainted, substitute assets that are restrained under § 1345).

This view is common sense. An example by the Fourth Circuit that was related by the *Bissell* decision is instructive:

> Suppose a bank is robbed and $100,000 taken. A defendant is arrested in possession of $100,000 and nothing more. The defendant protests his innocence and claims, without the slightest proof, that the $100,000 was in fact a gift from a friend. Surely no one will contend that the $100,000 must be made available to pay the defendant's lawyer, and not be kept available for return to the bank in the event the defendant is found guilty.

*Bissell*, 866 F.2d at 1351 (quoting *In re Forfeiture Hearing As to Caplin & Drysdale, Chartered*, 837 F.2d 637, 645 (4th Cir.1988), *aff'd sub nom., Caplin*, 491 U.S. 617, 109 S.Ct. 2646).

■ The reason the bank robber is not permitted to use the $100,000 to hire a lawyer is obvious. The money does not belong to him. But suppose the bank robber in the example above spent the $100,000 that he stole. It just so happens, however, that he has another $100,000 that he obtained legitimately. Should his decision to spend the $100,000 he stole mean that he is free to hire counsel with the other $100,000 when Congress has authorized restraint of those substitute assets? The reasonable answer is no. The bank has the right to have those substitute, untainted assets kept available for return as well. Therefore, in accord with the Fourth Circuit's view, the most reasonable conclusion is that there is no Sixth Amendment right to use untainted, substitute assets to hire counsel.

*v. Section 1345 allows for the restraint of assets that would otherwise be used for payment of attorney's fees*

■ Luis also argues that the purpose of § 1345 is to insure that the defendant is

not wasting or hiding assets, not to punish the defendant. As such, she argues that assets that will be used for attorney's fees should not be restrained. To the extent that Luis is arguing that the statute does not permit such assets to be restrained, this argument fails. However, the Court does have discretion to release assets for payment of attorney's fees.

 In exercising its discretion for release of assets for payment of attorney's fees, the Court should consider whether the defendant is able to afford representation in the § 1345 proceedings. *See United States v. Speqtrum, Inc.,* No. CIV.A. 10–2111 JEB, 2012 WL 517526, at *2 (D.D.C. Feb. 16, 2012); *United States v. Jaime,* No. 2:10–CV–00498, 2011 WL 145196, at *1–2 (S.D.W.Va. Jan. 18, 2011). If "restrained property is a defendant's only means of securing counsel" the Court may wish to exercise its discretion to release assets to secure counsel. *See Speqtrum, Inc.,* 2012 WL 517526, at *2. In this case, Luis was represented throughout the § 1345 proceedings by competent counsel. Therefore, this consideration is no longer relevant. In the criminal prosecution, Luis will be appointed counsel if she cannot afford representation.

### C. Conclusion

For the foregoing reasons, the Government's Motion for a Preliminary Injunction under 18 U.S.C. § 1345 [D.E. # 4] is GRANTED. The preliminary injunction order will be entered shortly. Luis's Motion to Modify the Restraining Order to Release Assets for the Defense of the Related Criminal Case [D.E. # 46] is DENIED.