**UNITED STATES of America and the State of Florida ex rel., Jack Carrel, Mauricio Ferrer, and Shawn Loftis, Plaintiffs,**

v.

**AIDS HEALTHCARE FOUNDATION, INC., Defendant.**

**CASE NO. 14–CV–61301–KMW**

United States District Court,. S.D. Florida.

Signed 06/09/2017

---

Geoffrey R. Kaiser, Pro Hac Vice, Kaiser Law Firm, PLLC, Unionable, NY, Susan Torres, U.S. Attorney's Office, Southern District of Florida, Christopher Ellis Gottfried, O'Quinn Stumphauzer & Sloman PL, Jeffrey Henry Sloman, Stumphauzer & Sloman, PLLC, Miami, FL, Diana Leigh Martin, Theodore Jon Leopold, Cohen, Milstein, Sellers & Toll, PLLC, Palm Beach Gardens, FL, James Paul Gitkin, Salpeter Gitkin, LLP, Fort Lauderdale, FL, Jill Marie Bennett, Stephen H. Thomas, Jr., Office of Attorney General, Tallahassee, FL, Casey M. Preston, Gary L. Azorsky, Raymond M. Sarola, Pro Hac Vice, Cohen Milstein Sellers & Toll, PLLC, Philadelphia, PA, for Plaintiffs.

Arti Bhimani, Courtney Conner, Tom Myers, Pro Hac Vice, AIDS Healthcare Foundation, Inc., David Horowitz, Gavin Campbell, Jay Bhimani, Pro Hac Vice, Kirkland & Ellis, LLP, Paul S. Chan, Pro Hac Vice, Marc E. Masters, Bird, Marella, Boxer, Wolpert, Nessim, et al., Mitchell A. Kamin, Covington & Burling, LLP, Los Angeles, CA, Jeffrey David Marcus, Michael Anthony Pineiro, Marcus Neiman & Rashbaum, LLP, Miami, FL, Jeffrey Adam Neiman, Marcus Neiman & Rashbaum LLP, Fort Lauderdale, FL, for Defendants.

## SEALED ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ■

KATHLEEN M. WILLIAMS,
UNITED STATES DISTRICT JUDGE

**THIS MATTER** is before the Court on Defendant AIDS Healthcare Foundation, Inc.'s ("AHF") motion for summary judgment based on the employee safe harbor exception to Anti–Kickback Statute liability. (Sealed motion, DE 171; Sealed exhibits to motion, DE 172; Redacted public motion, DE 174). Relators Jack Carrel, Mauricio Ferrer, and Shawn Loftis have filed a response in opposition to the motion (Response to motion, DE 183; Redacted public responsive facts, DE 184; Sealed responsive facts, DE 186) and AHF has filed a reply in support of the motion (Reply in support of motion, DE 188; Sealed reply in support of statement of material facts, DE 190).

The Relators, three former AHF employees, filed the operative Third Amended Complaint ("TAC") on July 10, 2015. (DE 59). They allege that AHF pays bonuses to employee "Linkage Coordinators" for referring patients who have tested positive for HIV at an AHF facility to other HIV/AIDS-related services that AHF provides. Relators argue these bonuses are kickbacks prohibited by the federal Anti–Kickback Statute ("AKS"), 42 U.S.C. § 1320(a)–7b(b). And because reimbursement claims for services provided to patients referred through AKS violations are deemed "false or fraudulent" as a matter of law, 42 U.S.C. § 1320(a)–7b(g), Relators assert that AHF's claims for federal funds in return for services provided following the purported kickbacks to Linkage Coordinators violate the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), and Florida False Claims Act ("FFCA"), Fla. Stat. § 68.082(2).

Although Relators alleged several broad-ranging kickback schemes, the TAC described in sufficient detail only two "Representative False Claims" in which AHF sought federal funds—through the

Ryan White Comprehensive AIDS Resources Emergency Act ("Ryan White")—in connection with services provided following bonuses to Linkage Coordinators. Accordingly, the Court entered an order on June 27, 2016 granting in part AHF's motion to dismiss and limiting the focus of this case to Relators' claims "regarding the Ryan White program only as they relate to the two Representative False Claims." (DE 95 at 36). Additionally, because the TAC alleged the Linkage Coordinators who were paid bonuses in connection with the Representative False Claims were AHF employees, the Court entered a Scheduling Order permitting an early round of dispositive motions as to the applicability of the AKs's employee safe harbor provision, 42 U.S.C. § 1320a–7b(b)(3)(B), to the facts of this case. (DE 106).

AHF's motion for summary judgment on the employee safe harbor is now before the Court. Because the undisputed facts demonstrate that AHF paid the bonuses connected to the two Representative False Claims to an AHF employee engaged in the provision of covered services, AHF's motion for summary judgment (DE 171; DE 174) is **GRANTED**.

## I. BACKGROUND [1]

AHF is a 30–year-old nonprofit corporation that provides HIV/AIDS-related services across the United States. (Defendant's statement of material facts DE 171–1 ¶¶ 1–2).[2] To obtain reimbursements for providing these services in Broward County, Florida, AHF entered agreements with the State of Florida Department of Health ("FDOH"). (DE 171–1 ¶¶ 4, 5). These agreements with FDOH required AHF to take efforts to ensure that patients testing positive for HIV received appropriate follow-up medical care. (DE 171–1 ¶¶ 4–5). For instance, Contract # BW266 between AHF and FDOH—which AHF "understands" FDOH to be funding through Ryan White Part B [3] grant funds (DE 171 at 10)—required AHF to "refer all individ-

---

**1.** This section sets forth the relevant admitted facts for purposes of summary judgment. In their respective statements of material facts, the Parties have provided various assertions that are supported by the record. In some instances, the Parties have not contested their adversary's assertions. In other instances, the Parties have contested their adversary's assertions but without citing sufficient materials in the record to refute those assertions. The Court will deem all of these uncontested—or insufficiently contested—factual assertions to be admitted. *See* S.D. Fla. L.R. 56.1(b); Fed. R. Civ. P. 56(c), (e). Additionally, the Court assumes familiarity with both the allegations in the TAC and the narrowed scope of those allegations on which the Court permitted this case to proceed. (DE 95 at 2–9).

**2.** Although Relators do not dispute that AHF is organized as a nonprofit corporation, they do dispute the extent to which AHF is motivated by revenues. For example, Relator Carrell and Relator Loftis both testified at their depositions that organizationally, AHF sought to keep patients in its own orbit of services to maximize revenues. (DE 186 ¶ 1). Relators also point to testimony from AHF's corporate representative, Michael Kahane, that AHF was motivated by a desire to increase reimbursement rates. (Kahane Deposition, DE 186–2 at 303).

**3.** Part B of the Ryan White statute, formally titled "Care Grant Program," permits the Secretary of the federal Department of Health and Human Services ("HHS") to, "subject to the availability of appropriations, make grants to States to enable such States to improve the quality, availability and organization of health care and support services for individuals and families with HIV/AIDS." 42 U.S.C. § 300ff–21. In contrast, Part A of the Ryan White statute, formally titled "Emergency Relief for Areas with Substantial Need for Services," requires the Secretary to make grants for the provision of HIV/AIDS-related services in specific "metropolitan area[s] for which there

uals newly diagnosed with HIV or those currently not in care to a healthcare Provider." (DE 172–8 at 11). A second agreement between AHF and FDOH, Contract # BW265—which AHF "understands" FDOH to be funding through the federal Centers for Disease Control and Prevention ("CDC") (DE 171 at 10)—required AHF to "implement a high-impact, comprehensive HIV prevention program" that would "[l]ink at least eighty percent (80%) of clients with a positive test result to medical care within ninety (90) days of their diagnosis." (DE 172–10 at 12). Under Contract # BW265, AHF was also required to "[p]rovide referrals to clients with preliminary or confirmed HIV-positive test results." (DE 172–10 at 13) (emphasis added). This contract also specifically defined the term "[l]inkage" as the "act of confirming that a client offered a voluntary service is successful in accessing that service" and the term "[l]inkage-to-care" as "[a]ssisting an individual in receiving medical care for HIV infection from a physician, physician's assistant, or nurse practitioner, usually within ninety (90) days of diagnosis. Linkage is the post-referral verification that the individual being referred to care accessed medical services. Linkage to medical care is the outcome of the referral." (DE 172–10 at 11).

Separately, AHF also entered Agreement Number 11–CP–HCS–8515–RW for fiscal year 2011 with Broward County, Florida, to receive federal Ryan White Part A funding for providing HIV/AIDS-related services. (DE 171–1 ¶ 7). Pursuant to this agreement, AHF was responsible for "directing individuals to ... primary care, counseling and testing, clinical diag-

nostic services, and **referrals to appropriate providers of health and support services**" and "**creat[ing] and implement[ing] policies for referring clients to ambulatory/medical care services** as requested by [the patient] if [the patient] is not in medical care." (DE 172–11 at 70) (emphasis added). AHF renewed this agreement for fiscal year 2012–2013 and fiscal year 2013–2014 and, as part of the renewal process during fiscal year 2013–2014, submitted a "line item budget justification" that disclosed the means by which it had chosen to provide these services: employing Linkage Coordinators who are "responsible for linking newly diagnosed HIV positive individuals to care and identify[ing] patient[s] who have been out of care back into care." (DE 172–14 at 18).

One of those Linkage Coordinators—and the individual who worked as the Linkage Coordinator for the two HIV-positive patients at the center of the allegations in this case, John Doe # 1 and John Doe # 2—was Julio Rodriguez. (DE 171–1 ¶ 10). After John Doe # 1 tested positive for HIV and attended two follow-up appointments with AHF healthcare providers, AHF paid Rodriguez a $100 bonus. (DE 171–1 ¶ 32; see also DE 172–47). Similarly, after John Doe # 2 attended two follow-up appointments with an AHF healthcare provider following his positive HIV test, AHF paid Rodriguez another $100 bonus. (DE 171–1 ¶ 33; see also DE 172–48). Indeed, around the time of the events involving John Doe # 1 and John Doe # 2, on every occasion an HIV-positive patient with whom Rodriguez worked as a Linkage Coordinator attended two

has been reported to and confirmed by the Director of the Center for Disease Control and Prevention a cumulative total of more than 2,000 cases of AIDS during the most

recent period of 5 calendar years for which such data area available." 42 U.S.C. § 300ff-11(a).

follow-up appointments with AHF health-care providers, AHF paid Rodriguez a $100 bonus. (DE 171–1 ¶ 31).

AHF disclosed these bonus payments to FDOH. For example, the "Program Budget" attached to Contract # BW266 describes the "Linkage Coordinator" personnel position as: "Links clients into care, base plus $100 per linkage." (DE 172–8 at 26). AHF also received reimbursements from FDOH for linkage bonuses paid to Rodriguez after submitting itemized breakdowns. (DE 171 at 11; DE 172–38; DE 172–39).

By every indication, Rodriguez was an AHF employee at the time he received these bonuses. He joined AHF in December 2010 as an HIV Testing Counselor and, before starting, had to fill out a Form I-9 Employment Eligibility Verification and authorize both credit and criminal background checks. (DE 171–1 ¶¶ 11, 18). A little over a year later, AHF offered Rodriguez a promotion to Linkage Coordinator, which he accepted. (DE 171–1 ¶¶ 11–12; see also DE 172–40 at 8–16)[4] AHF's formal offer of employment in connection with the promotion listed the Linkage Coordinator position as "full-time, regular," and "at-will." (DE 172–40 at 9–10). AHF controlled Rodriguez's work hours, during which Rodriguez was almost always at an AHF facility, representing AHF in interactions with patients. (DE 171 ¶¶ 24–25). Rodriguez used an AHF-provided computer at an AHF-provided desk and office space in AHF's Southern Bureau headquarters in Fort Lauderdale, Florida. (DE 171–1 ¶ 26). Rodriguez was not employed in any capacity other than as a Linkage Coordinator when he was paid the bonuses. (DE 171–1 ¶ 27). Additionally, Rodriguez drew a salary from AHF that was paid on a biweekly basis through direct deposit to his bank account. (DE 171–1 ¶ 20). As with any other employee, AHF deducted relevant state and federal taxes and made voluntary deductions from Rodriguez's salary checks based on his elections. (DE 171–1 ¶ 20). Rodriguez was eligible for AHF's employee benefits such as a 401 (k) plan and health insurance, and AHF provided Rodriguez with a Form W-2 listing his annual wages for each year he has been employed. (DE 171–1 ¶¶ 20–21). In light of all these factors, AHF and Rodriguez considered themselves to have an employer-employee relationship. (DE 171–1 ¶ 23).

In his role as Linkage Coordinator, Rodriguez counseled patients who had just received positive HIV tests, explained next steps, assessed and helped reduce barriers patients faced in accessing care, and engaged in follow-up contact as necessary to ensure that clients adhered to medical appointments. (DE 171–1 ¶ 13). Before taking the Linkage Coordinator role, he acknowledged he had a read an AHF job description detailing 22 "Essential Duties and Responsibilities" (DE 172–40 at 11–12) of the position. These delineated duties included "ensur[ing] the referral of 100% of preliminary positive clients into care from multiple AHF HIV test sites into AHF Healthcare Centers (HCC) and AHF pharmacies or other appropriate remote healthcare referral loca-

4. AHF set the qualifications for the Linkage Coordinator position, which included maintaining various certifications, possessing six months of experience as an HIV testing counselor, and having a valid Florida driver's license. (DE 171–1 ¶ 16; DE 172–40 at 15).

Before beginning as a Linkage Coordinator, Rodriguez trained for the role by shadowing other Linkage Coordinators and received computerized trainings on, among other matters, compliance with the AKS. (DE 171–1 ¶ 17; DE 186 ¶ 17).

tions within 72 hours." (DE 172–40 at 11). They also included other responsibilities that went beyond referral, such as contacting HIV positive patients, processing samples and finger stick tests; disclosing and delivering confirmatory HIV test results; exploring the patient's "readiness ... in overcoming barriers to seek HIV specialty care"; implementing cost controls to ensure "thorough and efficient client testing and referral services to as many individuals as possible"; providing patients with referrals to social services; and working as a "liaison between all positive clients identified through .... testing programs and AHF HCCs for confirmed linkage into care." (DE 172–40 at 11–12).[5] Consistent with this "Essential Duties and Responsibilities" list, Rodriguez confirmed that his responsibilities varied depending on the individual patient's needs, and he viewed his role as more holistic than the simple generation of referrals of patients to AHF's follow-on services. (DE 171–1 ¶¶ 14–15).

Relators do not dispute that AHF was obligated through its agreements with FDOH and Broward County to link patients testing positive for HIV to appropriate follow-up care. Nor do they dispute that AHF employed Linkage Coordinators such as Rodriguez whose formal job responsibilities included performing various "linkage-to-care" services. Instead, they attack the motivations behind AHF's compensation structure for Linkage Coordinators. Specifically, Relators describe AHF's bonus payments to Linkage Coordinators as an illegal effort to steer patients exclusively to AHF's other HIV/AIDS-related services. (Relators' responsive facts, DE ¶¶ 8–9). In support, Relators point to their own deposition testimony and the deposition testimony of various AHF employees suggesting that AHF did not pay bonuses to Linkage Coordinators when patients elected to obtain follow-up treatment from non-AHF healthcare providers. (DE 186 ¶ 8). They note that AHF paid Rodriguez his $100 bonuses through checks separate from his regular salary checks. (DE 186 ¶ 20). They also point out that AHF's agreements with FDOH and Broward County did not expressly authorize "linkage only to AHF facilities" or the "payment of incentive bonuses for the referral of patients into treatment with AHF." (DE 186 ¶ 4)[6]

AHF responds that its Linkage Coordinators do not steer HIV-positive patients to its own services. Both Rodriguez and AHF's corporate representative Michael Kahane stated that, consistent with AHF's written policies, Linkage Coordinators gave patients a "providers list" that included non-AHF HIV/AIDS healthcare providers in Broward County—and that patients made the ultimate decisions about which provider to use. (Defendant's reply in support of statement of material facts

---

5. FDOH also perceived linkage-to-care as much more than referral. FDOH's expanded conception of linkage is reflected in its internal operating procedures, which notes that "[l]inkages differ from referrals because linkages require providers to take whatever steps are necessary to ensure that the client accesses needed services" (DE 172–25 at 13); an FDOH presentation dated May 2012 contrasting linkage, in which a patient receives assistance in actually attending follow-up care,

and a referral, in which the patient is simply given a provider's information (DE 172–24 at 15); and an FDOH handout titled "Linkage: More Than a Referral" that describes "linkage" as a more holistic assistance for patients than a simple referral (DE 172–26 at 2).

6. The plain language of AHF's contracts with FDOH and Broward County, however, reveal no prohibition on such referrals either.

DE 190 ¶ 8). Kahane also explained that AHF lost money on each Ryan White patient linkage and that the real reason AHF did not pay bonuses where patients opted for a non-AHF provider is that AHF could not always verify whether patients attended follow-up meetings with such providers. (Kahane Deposition, DE 186–2 at 74–75). Relators dismiss these explanations and contend that AHF's Linkage Coordinators did not actually give patients the full "providers list," pointing to Relator Carrel's statement that AHF regularly and purposefully deviated from this practice to "ensure that the patient was at AHF." (DE 186 ¶ 8; *see also* Carrel Deposition, DE 186–1 at 129–30).

The material facts are not in dispute. Federally funded agreements with FDOH and Broward County required AHF to ensure that patients testing positive for HIV received appropriate follow-up medical care; AHF employed Linkage Coordinators, including Rodriguez, to fulfill these requirements in a number of ways; and AHF paid $100 bonuses to Rodriguez after confirming that HIV-positive patients with whom he worked attended two follow-up appointments with an AHF healthcare provider. As discussed in Section III below, the only genuine factual dispute that exists at this stage is the extent to which AHF's desire to generate patient referrals for its other healthcare services motivated its bonuses to Linkage Coordinators.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "[i]f the non-movant ... fails to adduce evidence which would be sufficient ... to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue*

*Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III. DISCUSSION

Relators assert that AHF's bonus payments to Julio Rodriguez were illegal kickbacks prohibited by the AKS and, in turn, that claims for any services that AHF rendered to patients referred through such bonuses violated the FCA and FFCA.[7] AHF moves for summary judgment, arguing the bonuses fall under the AKs's "employee safe harbor" as a matter of law and therefore cannot be the basis for Relators' FCA and FFCA claims. The Court agrees with AHF and grants summary judgment.

Congress first enacted the AKS in 1972 to curtail health care referrals considered unethical or inappropriate. *See* Social Security Amendments of 1972, Pub. L. No. 92–603, § 242(b), 86 Stat. 1329, 1419 (1972); *see also State v. Harden*, 938 So.2d 480, 487 (Fla. 2006) (reviewing history of amendments to AKS). In its current form, the AKS provides:

whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any

item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,[8]

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a–7b(b)(1). The AKS also prohibits anyone from "knowingly and willfully offer[ing] or pay[ing] any remuneration" for the same purposes. 42 U.S.C. § 1320a–7b(b)(2).

The AKs's prohibitions, however, are not absolute. In 1987, Congress amended the AKS to establish several exceptions. *See* Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100–93, §§ 4, 14, 101 Stat. 680, 688–89, 697–98 (1987). According to the Department of Health and Human Services Office of Inspector General's ("OIG") commentary to the proposed and final regulations, these exceptions reflected a concern that the AKS had been so broad that "some relatively innocuous commercial arrangements were technically covered by the statute and therefore were subject to criminal

---

7. As the Court has previously explained (DE 95 at 5–6), although the AKS does not create a private cause of action, violation of the statute can be the basis for an FCA violation. 42 U.S.C. 1320a–7b(g).

8. The AKS defines a "Federal health care program" as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the

United States Government." 42 U.S.C. § 1320a–7b(f). The Parties assume in their briefing—and the Court has no reason to disagree—that FDOH and Broward County, as grantees of Ryan White and other federal funds, made payments under "Federal health care programs" by reimbursing AHF through the contracts discussed in Section I, *supra*.

prosecution." Medicare and Medicaid Programs: Fraud and Abuse, OIG Anti–Kickback Provisions, 54 Fed. Reg. 3088, 3088 (Jan. 23, 1989) (proposed rule); *see also* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35,952, 35,952 (July 29, 1991) (codified at 42 C.F.R. § 1001.952 (2005)) (final rule).

■ One of these exceptions, the employee safe harbor, exempts from AKS liability "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a–7b(b)(3)(B). The justification for the employee safe harbor is the legitimacy of a formalized employment relationship. *See State v. Harden*, 938 So.2d 480, 488–89 (Fla. 2006) ("The employee safe harbor presumes a reduced potential for program abuse because of the greater degree of control that employers are presumed to exercise over their employees."); Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35,952, 35,981 (July 29, 1991) ("We are confident that the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them."). Consistent with this justification, OIG's commentary to the proposed rule implementing the employee safe harbor noted the exception "permits an employer to pay an employee in **whatever manner he or she chooses** for having that employee assist in the solicitation of . . . health care program business" and to encourage formal employment so that "entities **desir[ing] to pay a salesperson on the basis of the amount of business they generate** . . . [can] exert appropriate supervision." Medicare and Medicaid Programs, Fraud and Abuse OIG Anti–Kickback Provisions, 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989) (emphasis added).

■ In line with the statutory text, the party claiming protection of the employee safe harbor must demonstrate (1) that the challenged payment was from an employer to an employee with whom there is a bona fide employment relationship; and (2) the payment was for employment in the provision of covered services. *See Harden*, 938 So.2d at 494 ("The burden of proof lies with the entity or individual claiming a safe harbor as a defense.") (citations omitted). Applying this test, AHF is entitled to summary judgment because its bonus payments to Rodriguez and other Linkage Coordinators satisfy both elements of the AKS employee safe harbor.

■ As to the first element of the employee safe harbor, the undisputed facts show that Rodriguez was an AHF employee. Before beginning work with AHF, he filled out various employment-related forms, underwent background checks, and acknowledged that he had read AHF's employment policies. AHF produced documentation of Rodriguez's promotion to Linkage Coordinator that described his position as "full time, regular," and "at-will." Both AHF and Rodriguez confirmed that they viewed the relationship as one between employer and employee. Rodriguez worked at an AHF facility using AHF supplies, and AHF deducted taxes from Rodriguez's normal paychecks and provided Rodriguez with tax forms. Relators agree that Rodriguez worked for AHF in a formal capacity.

■ Regarding the second element of the employee safe harbor, the Court finds

that the $100 referral bonuses were for "the provision of covered ... services." 42 U.S.C. § 1320a–7b(b)(3)(B). Several contracts required AHF to provide linkage-to-care services in Broward County during the period Rodriguez received bonuses for referring John Doe # 1 and John Doe # 2 to an AHF healthcare provider. Under two of those contracts, AHF received federal Ryan White funds in part for providing the referrals that Relators challenge: Part A funds through the agreement with Broward County for fiscal year 2011 (renewed in 2012–2013 and again in 2013–2014) and Part B funds through Contract # BW266 with FDOH.[9] The Ryan White statute expressly authorizes federal funding for the referrals Rodriguez generated as an AHF employee. Specifically, the statute requires that funds granted under either Part A or Part B "will be expended only for ... core medical services." 42 U.S.C. § 300ff–14(a)(2)(A) (Part A); 42 U.S.C. § 300ff–22(a)(1) (Part B). Both Part A and Part B of the statute define "core medical services" to include "[e]arly intervention services." 42 U.S.C. § 300ff–14(c)(3)(E) (Part A); 42 U.S.C. § 300ff–22(b)(3)(E) (Part B). Under Part A, early intervention services include "referrals of individuals with HIV/AIDS to appropriate providers of health and support services, including, as appropriate ... entities receiving amounts under [Ryan White] for the provision of such services[.]" 42 U.S.C. § 300ff–51 (e)(2)(A). Under Part B, early intervention services include not only the referrals described in the previous sentence but also "follow-up referral provided for the purpose of facilitating the access of individuals receiving the services to HIV-related health services." 42 U.S.C. § 300ff–22(d).

Importantly, and contrary to Relators' assertions, the Ryan White statute and AHF's agreements with FDOH and Broward County do not require that these referrals be to a healthcare provider independent from the referring organization. To the contrary, when Congress was implementing and later amending the Ryan White statute, it expressly considered and endorsed the idea that one organization could provide both HIV/AIDS diagnostic services and follow-up primary medical care. See S. Rep. No. 101–273, 18 (1990) ("States may use funds to integrate early diagnosis and intervention services with primary health and support services."); S. Rep. No. 104–25, at 6 (1996) ("The availability of health care and support services for HIV infected women and children 'under one roof' is critical."); H.R. Rep. No. 104–245, at 31 (1996) ("The Committee ... received reports of grantees that have sought to spend most of their funds on non-medical services, while referring their clients elsewhere for health care."). Thus, FDOH and Broward County properly reimbursed AHF's bonuses to Rodriguez because—even assuming the bonuses were solely for the purpose of generating referrals to AHF's own healthcare providers—the referrals were "covered ... services" under the employee safe harbor. On this basis alone, the bonuses at issue in this case are not actionable under the AKS and cannot support claims for violations of the FCA and FFCA.

Relators respond by advancing a much narrower interpretation of the employee

9. AHF "understands" that FDOH funded Contract # BW265 using funds from CDC, but makes no claim that these funds were from the Ryan White program. (DE 171 at 10). In any event, the Court allowed this matter to proceed just on claims involving the "Ryan White program only as they relate to the two Representative False Claims." (DE 95 at 36).

safe harbor—and a much broader interpretation of AKS liability—than is appropriate on these facts. They contend that the AKS strictly outlaws all payments for referrals and that courts may never apply the employee safe harbor to protect such payments. They base this argument primarily on the Eleventh Circuit's decision in *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998). In that case, the government prosecuted Angela Starks and Andrew Siegel for criminal violations of the AKS. Starks worked for a federally funded research project, Project Support, that advised pregnant women about possible treatments for drug abuse. *Starks*, 157 F.3d at 836. Siegel was president of Future Steps, a corporation that operated drug treatment programs in conjunction with a hospital receiving Medicare funding. *Id.* At trial, the government presented evidence that Future Steps paid kickbacks to Starks and her colleague, Barbara Henry, for patient referrals from Project Support. *Id.* at 836. Among the kickbacks that Starks and Henry accepted from Future Steps were checks delivered "in the Project Support parking lot or at a restaurant" and $600 in cash paid "in a restaurant restroom." *Id.* In addition to accepting kickbacks, Starks and Henry pressured some patients to attend Future Steps' drug counseling programs by "threaten[ing] women with the loss of their babies if they did not go specifically to Future Steps." *Id.* at 837. A jury found both defendants guilty of violating the AKS.

In appealing their convictions, Starks and Siegel argued that the AKS "is unconstitutionally vague because people of ordinary intelligence in either of their positions could not have ascertained from a reading of its [employee] Safe Harbor provision that their conduct was illegal." *Id.* at 839.

The Eleventh Circuit summarily rejected this vagueness challenge:

> Both the particular facts of this case and the nature of the Anti–Kickback statute, however, undercut Starks and Siegel's vagueness argument. First, even if Starks and Siegel believed that they were bona fide employees, they were not providing "covered items or services." As the government has shown, Starks received payment from Siegel and Future Steps only for referrals and not for any legitimate service for which the Hospital received any Medicare reimbursement. At the same time, persons in either Siegel's or Starks's position could hardly have thought that either Starks or Henry was a bona fide employee; unlike all of Future Steps's other workers, Starks and Henry did not receive regular salary checks at the Hospital. Instead, they clandestinely received their checks (often bearing false category codes) or cash in parking lots and other places outside the Project Support clinic so as to avoid detection by other Project Support workers.

*Starks*, 157 F.3d at 839. According to Relators, this passage and the statutory text require the Court to "examine the specific payment at issue" and divine the "purpose for which the payment was made" in deciding whether the employee safe harbor applies. (DE 183 at 13). If the particular payment challenged was for the purpose of inducing referrals, Relators say, then it is not protected by the employee safe harbor. (DE 183 at 6). Under this framework, Relators argue the bonuses AHF paid to Rodriguez do not qualify for the employee safe harbor because AHF paid each bonus for the improper purpose of inducing a referral to AHF's own medical services.

Relators' attempt to reinterpret the employee safe harbor pursuant to *Starks* is

unconvincing for four reasons. First, *Starks*'s holding is consistent with the Courts decision in this case. The Eleventh Circuit held that Starks could not claim the employee safe harbor because she "received payment from Siegel and Future Steps only for referrals **and not for any legitimate service for which the Hospital received any Medicare reimbursement.**" *See Starks*, 157 F.3d at 839 (emphasis added). Stated another way, Starks could not claim the employee safe harbor because her only connection to Future Steps was that she induced improper referrals—sometimes through threats to patients that they would be deprived of parental rights. These referrals were plainly not a "legitimate service" eligible for government reimbursement. *See id.* This case presents absolutely no allegations of coercion. Additionally, as discussed, both FDOH and Broward County contracted with AHF specifically to refer HIV-positive patients to follow-up medical services and then reimbursed AHF—including for the referral bonuses—with funds derived from a federal statute that permits such referrals. The Court does not read *Starks* as a blanket condemnation of these types of authorized referrals, which the Eleventh Circuit had no occasion to consider in the vagueness challenge advanced in that criminal case.

Another key fact—which Relators dismiss—plainly distinguishes this case from both *Starks* and *Borrasi*, the other criminal case [10] on which Relators rely: Rodriguez is undisputedly a bona fide AHF employee. In contrast, Starks received kickbacks in a parking lot and in restaurant restrooms and was not a Future Steps employee by any legitimate measure. *Starks*, 157 F.3d at 839. In *Borrasi*, the Seventh Circuit affirmed an AKS conviction against Roland Borrasi, a doctor who owned a corporate group of healthcare providers called Integrated Health Centers, S.C. *United States v. Borrasi*, 639 F.3d 774, 776–77 (7th Cir. 2010). Borrasi and other doctors at Integrated Health Centers, S.C. took "bribes" for referring patients to an inpatient psychiatric hospital called Rock Creek Center, L.P. *Id.* "In order to conceal these bribes, Borrasi and other Integrated employees were placed on the Rock Creek payroll, given false titles and faux job descriptions, and asked to submit false time sheets." *Id.* at 777.

In appealing his conviction, Borrasi cited the prosecutors argument at closing that it "did not matter if any portion of Rock Creek's payments to him or other Integrated physicians was pursuant to a legitimate employment relationship because the

---

**10.** The Court is unpersuaded by the many cases Relators cite which discuss the AKS's general prohibitions without discussing the applicability of the employee safe harbor *See e.g., United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed.Appx. 693 (11th Cir. 2014); *United States v. Jackson*, 220 Fed. Appx. 317 (5th Cir. 2007); *Ameritox, Ltd. v. Millennium Labs., Inc.*, 20 F.Supp.3d 1348 (M.D. Fla. 2014); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2013 WL 1289260 (S.D. Fla. Mar. 27, 2013); *United States ex rel. Bartlett v. Ashcroft*, 39 F.Supp.3d 656, 677 (W.D. Pa. 2014) ("[O]f critical importance, Defendants have not argued that the pertinent payments fit within the safe harbors of the Anti–Kickback Statute."); *United States ex rel. Armfield v. Gills*, No. 8:07-CV-2374-T-27TBM, 2012 WL 5340131, at 3–5 (M.D. Fla. Oct. 29, 2012) (discussing applicability of AKS safe harbor provisions related to space and equipment rentals and personal services and management contracts), *United States v. Rogan*, 459 F.Supp.2d 692, 722 (N.D. III. 2006) (discussing applicability of AKS safe harbor provisions related to personal services and management contracts); *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F.Supp.2d 39, 80 (D. Mass. 2011) (discussing applicability of AKS safe harbor provisions related to group purchasing agents).

statute was violated if any portion of the payments was for patient referrals." *Id.* at 781. Without analyzing the applicability of the employee safe harbor's text for a criminal prosecution, the Seventh Circuit affirmed Borrasi's conviction, observing that "[b]ecause at least part of the payments to Borrasi was intended to induce him to refer patients to Rock Creek, the statute was violated, even if the payments were also intended to compensate for professional services." *Id.* at 782 (quotation marks and citation omitted). Importantly though, like Starks, Borrasi was never a bona fide employee of the organization that paid him kickbacks. In fact, Borrasi actively faked his employment at that organization to conceal the bribes he received. *Id.* at 777. The Court finds *Borrasi* inapplicable because there is no evidence that AHF fraudulently employed Rodriguez to hide the bonus payments at issue. To the contrary, AHF actively and accurately disclosed Rodriguez's employment and payment structure to FDOH.

The second reason Relators' interpretation of the employee safe harbor fails is that it applies *Starks* in a way that would read the exception out of the statute. *See F.D.A. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("A court must ... interpret the statute as a symmetrical and coherent regulatory scheme ... and fit, if possible, all parts into an harmonious whole."); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct.

3014, 73 L.Ed.2d 664 (1982) (discussing "the well-settled rule that all parts of a statute, if possible, are to be given effect."). Other courts have rejected Relators' same argument for precisely this reason. *United States ex rel. Baklid–Kunz v. Halifax Hospital Medical Center,* No. 6:09-CV-1002-ORL-31, 2013 WL 6196562, at *8 (M.D. Fla. Nov. 26, 2013); *United States v. Vista Hospice Care, Inc.,* No. 3:07-CV-00604-M, 2016 WL 3449833, at *23 (N.D. Tex. June 20, 2016); *United States v. Crinel,* No. CRIM.A. 15–61, 2015 WL 3755896, at *6 (E.D. La. June 16, 2015). For instance, in *Halifax,* the district court considered a relator's FCA case against a hospital based on alleged violations of the AKS involving payments to physicians. *Halifax,* 2013 WL 6196562 at *1. The hospital, through a staffing arm, employed six medical oncologists who were part of an "[i]ncentive [c]ompensation pool" that awarded payments for "personally performed services."[11] *Id.* at *2. The relator argued these "payments ... derived from a bonus pool that was comprised of profits from the [o]ncologists' referrals" and therefore were not protected by the employee safe harbor because—just as the Relators argue here they were designed to induce impermissible referrals to the defendant's outpatient services. *Id.* at *8. The *Halifax* court rejected this argument:

> Relator is arguing that the Incentive Bonus payments were kickbacks from referrals, and kickbacks from referrals cannot qualify as the sort of payments

---

11. Relators attempt to distinguish *Halifax* because the employees in that case were paid for "personally performed services." (DE 183 at 7–8). But the relator in that case alleged that these payments came from a pool composed of referral profits and argued—like the Relators here—that the payments were designed to induce improper exclusive referrals. *Halifax,* 2013 WL 6196562, at *8. Relators'

subsequent attempt to bolster this distinction by citing to *Obert–Hong v. Advocate Health Care,* 211 F.Supp.2d 1045 (N.D. Ill. 2002) is unpersuasive. That court, in dicta, adopted Relators' position that any payments "directly related to referrals" are not covered by the employee safe harbor. *Id.* For the reasons discussed throughout this Order, the Court finds this position unconvincing here.

protected by the Bona Fide Employment Exception. But to accept Relator's argument would result in the rule swallowing the exception.

Simply stated, the Bona Fide Employment Exception provides that the normal prohibition on payments to induce referrals does not apply where the payments are made to a (for lack of a better word) legitimate employee. 42 U.S.C. § 1320a–7b(b)(3). The Relator would change that to read that the prohibition on payments to induce referrals does not apply where the payments are made to a legitimate employee *unless they ere payments to induce referrals*. The exceptions set forth in the Anti–Kickback Statute and accompanying regulations "provide immunity from prosecution for behavior that might have violated the Anti–Kickback Statute." *State v. Harden*, 938 So.2d 480, 488–89 (Fla. 2006). The Relator's interpretation of the Bona Fide Employment Exception would eviscerate it.

*Halifax*, 2013 WL 6196562, at *8 (emphasis in original).

*Halifax* is precisely on point.[12] Relators' interpretation of the AKS here would render the employee safe harbor superfluous and would leave AHF unable to pay employees for performing authorized services in a manner that "reward[s] employees based on success"—as was the case before Congress enacted the exception. *See Vista Hospice Care*, 2016 WL 3449833, at *23.

The third flaw with Relators' argument is that it relies heavily on *Luis*—in which another court in this District appears to read the employee safe harbor's statutory text narrowly—but fails to place that case in the appropriate context. *United States v. Luis*, 966 F.Supp.2d 1321, 1330–31 (S.D. Fla. 2013), *aff'd*, 564 Fed.Appx. 493 (11th Cir. 2014), *rev'd*, — U.S. —, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016), *and vacated and remanded*, 653 Fed.Appx. 904 (11th Cir. 2016). There, the court granted a preliminary injunction restraining the assets of Sila Luis, whom the government had separately charged with criminal violations of the AKS. *Id.* at 1335. In the adjunct criminal case, the government alleged that Luis's healthcare businesses paid kickbacks to employee nurses for improper patient referrals while fraudulently billing Medicare for "services that were not medically necessary or were not actually provided." *Id.* at 1327. The government thus sought, in the civil forfeiture proceeding, to preliminarily restrain Luis's assets. *Id.* at 1325. Luis responded by arguing that "some of the payments made to nurse/patient recruiters" for patient referrals were protected by the AKS's employee safe harbor. *Id.* at 1330. Relying on *Starks* and *Borrasi*, the *Luis* court rejected this argument and found that the employee safe harbor did not exempt payments that were not for "furnishing or providing covered items or services." *id.* at 1330.[13] In support, the *Luis* court cited language from *Starks* that "Starks and Henry were not

---

12. It should also be noted that challenged referrals in *Halifax* (a post-*Starks* decision)—made by medical oncologists employed by the defendant hospital to the hospital's outpatient services—are similar to the challenged referrals here in that they were for medically necessary services, were "part of the normal, legitimate duties" of the referring employees, and were thus authorized in a way that the referrals in the criminal *Starks* and *Borrasi*

cases were not. *See Halifax*, 2013 WL 6196562, at *8 n.8.

13. Notably, in declining to apply the employee safe harbor, the *Luis* court also observed that "even if Luis's view of the scope of the safe harbor provisions were correct, her contention that the patients, who were referred ... received medically necessary services is dubious." *Luis*, 966 F.Supp.2d at 1331. In

compensated for providing 'covered items or services.'" *Id.* at 1331 (citing *Starks*, 157 F.3d at 839). It also cited OIG's regulation implementing the employee safe harbor, which states that the exception exempts "any amount paid by an employer to and employee ... *in the furnishing* of any item or service for which payment may be made" under Federal health care programs. See *id.* at 1330–31 (emphasis in original) (quoting 42 C.F.R. § 1001.952(i)).

Relators argue that *Luis* supports their narrow interpretation of the employee safe harbor, but their reliance on this case is unpersuasive for several reasons. First, *Luis* is distinguishable because the payments to nurses in that case were not authorized by federal statute; to the contrary, they were one basis for Luis's criminal prosecution. *Id.* at 1331. In contrast, AHF's bonus payments to Linkage Coordinators were authorized by the Ryan White statute and thus were payments for "covered services" protected by the employee safe harbor. Second, the *Luis* court discussed the AKs's employee safe harbor in the context of entering a preliminary injunction in a civil forfeiture proceeding related to an ongoing criminal prosecution. This case features no allegation of criminal misconduct in relation to AHF's bonus payments.

Additionally, Relators' position and the *Luis* court's discussion seemingly narrow

what the text of the safe harbor actually protects. The exception's statutory text exempts "any amount paid by an employer to an employee ... **for employment in the provision** of covered items or services." 42 U.S.C. § 1320a–7(b)(3)(B) (emphasis added). Although Relators and *Luis* read this provision to exempt only the specific amounts paid by an employer to an employee for "providing" or "furnishing" covered services, other courts have rejected such a constrained reading. *See Hericks v. Lincare, Inc.,* No. 07-387, 2014 WL 1225660, at *14 n.17 (E.D. Penn. Mar. 25, 2014) (applying employee safe harbor because "the employees are employed by [the defendant] for more than simply referrals" and perform other covered services); *Vista Hospice Care,* 2016 WL 3449833, at *22 ("The statutory exception applies to payments *for employment in the provision* of covered services, not *for providing* covered services.") (emphasis in original).

In this case, the text of the exception seems applicable not only because AHF's bonuses paid for "covered services," but also because Linkage Coordinators like Rodriguez were "employ[ed] in the provision of" other covered services.[14] See 42 U.S.C. § 1320a–7b(b)(3)(B). Contrary to Relators' arguments, this understanding of the safe harbor's scope would be consistent

---

contrast, Relators do not dispute that the services rendered following Rodriguez's referral of John Doe # 1 and John Doe # 2 to AHF healthcare providers were medically necessary. The Eleventh Circuit affirmed the *Luis* summarily, finding that there was "probable cause to believe that Luis committed an offense requiring forfeiture." *United States v. Luis,* 564 Fed.Appx. 493, 494 (11th Cir. 2014), *rev'd on other grounds,* — U.S. ——, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016). However, the Eleventh Circuit's order, which the Supreme Court vacated, provided no guidance on whether it relied on the district court's

reading of the employee safe harbor or on the district court's alternative holding that the services provided following these referrals were not medically necessary.

**14.** These other covered services included patient counseling, processing samples and delivering test results, implementing cost controls to ensure wider access to AHF's services, assessing and reducing barriers to care, and engaging in follow-up contact as needed to ensure that the client actually attended medical appointments.

with *Starks*. There, the Eleventh Circuit never analyzed whether Starks was "employed in the provision of" covered services because it did not have to: the employee safe harbor clearly did not render the AKS vague as applied because Starks was not a Future Steps employee at all and the only services she was providing were unauthorized referrals that were occasionally induced by threat. *Starks*, 157 F.3d at 839. Nevertheless, the Court need not decide whether Relators' narrow reading of the employee safe harbor is correct because the referrals Relators challenge here are plainly "covered services" under the Ryan White statute meaning AHF's payments exclusively for those referrals are exempted under any interpretation of the exception.

Fourth and finally, the regulatory history of the employee safe harbor counsels decisively against Relators' interpretation. In explaining the final rule implementing the employee safe harbor, OIG noted that, like Relators, "[t]wo commenters questioned the wisdom of the employee exception, stating that health care providers should not be able to refer patients to other health care providers within their own offices because abuse could be worse than when individuals or entities make referrals to outside sources." Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35,952, 35,981 (July 29, 1991). But OIG rejected this comment because "[t]he exception for bona fide employment relationships is clear on the face of the statute, and we are not free to ignore that statutory mandate." *Id.* Further, OIG explained in the preamble to the proposed rule that the employee safe harbor "permits an employer to pay an employee in whatever manner he or she chooses for having that employee assist in the solicita-

tion of . . . health care program business." Medicare and Medicaid Programs, Fraud and Abuse OIG Anti–Kickback Provisions, 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989). Relators respond with inapposite citations to commentary on distinct exceptions to the AKS, narrow readings of the safe harbor that the Department of Justice has advanced in factually distinguishable criminal prosecutions, and advisory opinions that note the *potential* applicability of the AKS to distinguishable factual situations. (DE 183 at 17–20). However, what the regulatory history makes clear is that by enacting the employee safe harbor, Congress has already made a considered policy choice to exempt the conduct with which Relators take issue. Consequently, the policy objections that animate Relators' reading of the AKS here—such as concerns about the impacts of AHF's "patient steering" on "patient freedom of choice"—are not supported by either the statutory text or legislative history and are not considerations for the Court in deciding whether the employee safe harbor applies in this instance.

The undisputed facts show that AHF's bonuses to Rodriguez, which Relators claim violate the AKS, are exempt under the AKs's employee safe harbor. And because these bonuses serve as the foundation for Relators' FCA and FFCA claims, AHF is entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, it is **OR-DERED AND ADJUDGED** that Defendant's motion for summary judgment on the employee safe harbor (DE 171, DE 174) is **GRANTED**. Defendant's motion for judgment on the pleadings (DE 178) is **DENIED AS MOOT.** By **June 23, 2017,** the Parties shall jointly file under seal and

submit in Microsoft Word format to chambers at williams@flsd.uscourts.gov a proposed redacted public version of this Order. After entering the redacted public version of this Order, the Court will enter final judgment separately pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in chambers in Miami, Florida, this 9th day of June, 2017.